[Cite as *State v. Bridgeman*, 2011-Ohio-2680.]

IN THE COURT OF APPEALS FOR CHAMPAIGN COUNTY, OHIO

STATE OF OHIO                                    :

    Plaintiff-Appellee                        :          C.A. CASE NO. 2010 CA 16

v.                                               :          T.C. NO.    08CR81

ADAM BRIDGEMAN                                   :           (Criminal appeal from
                                                             Common Pleas Court)

    Defendant-Appellant                       :

                                                 :

. . . . . . . . . .

**O P I N I O N**

Rendered on the ____3rd____ day of ____June____, 2011.

. . . . . . . . . .

NICK A. SELVAGGIO, Atty. Reg. No. 0055607, 200 N. Main Street, Prosecuting Attorney, Urbana, Ohio 43078
    Attorney for Plaintiff-Appellee

ANDREA G. OSTROWSKI, Atty. Reg. No. 0075318, 25 E. Central Avenue, Suite 4, Springboro, Ohio 45066
    Attorney for Defendant-Appellant

. . . . . . . . . .

FROELICH, J.

{¶ 1} Adam Bridgeman was convicted after a jury trial in the Champaign County Court of Common Pleas of aggravated robbery, aggravated burglary, and grand theft in an amount of $5,000 or more but less than $100,000, arising out of the robbery of the

Christiansburg branch of the First Central National Bank on December 17, 2007.[1]  Each count contained a firearm specification.  The trial court sentenced Bridgeman to an aggregate term of thirteen years in prison and ordered him to pay restitution in the amount of $8,218.

{¶ 2}  Bridgeman appeals from his convictions.  He claims that the trial court erred in not allowing him to try on the boots allegedly worn by the perpetrator, that the trial court should have granted his Crim.R. 29 motion for a judgment of acquittal, and that his convictions are against the manifest weight of the evidence.  For the following reasons, Bridgeman's convictions will be affirmed.  However, because the court failed to merge allied offenses of similar import, Bridgeman's sentence will be reversed and the matter will be remanded for resentencing.

I

{¶ 3}  We begin with Bridgeman's second assignment of error, which states:

{¶ 4}  "THE TRIAL COURT ERRED IN OVERRULING DEFENDANT'S CRIMINAL RULE 29 MOTION BECAUSE THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT THE CHARGES."

{¶ 5}  Bridgeman claims that the trial court should have granted his Crim.R. 29 motion, because the State failed to present sufficient evidence of venue or that Bridgeman was the perpetrator.

{¶ 6}  A sufficiency of the evidence argument challenges whether the State has

---

[1] This was Bridgeman's second trial.  Bridgeman was originally convicted by a jury on June 24, 2008.  On appeal, we reversed his convictions due to an erroneous evidentiary ruling and remanded the case to the trial court.  *State v. Bridgeman*, Champaign App. No. 2008 CA 19, 2009-Ohio-4578.

presented adequate evidence on each element of the offense to allow the case to go to the jury or to sustain the verdict as a matter of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 1997-Ohio-52. The proper test to apply to such an inquiry is the one set forth in paragraph two of the syllabus of *State v. Jenks* (1991), 61 Ohio St.3d 259: "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."

{¶ 7} Although venue is not a material element of an offense, it is a fact that must be proved beyond a reasonable doubt, unless it is waived by the defendant. *State v. Headley* (1983), 6 Ohio St.3d 475, 477; *State v. Draggo* (1981), 65 Ohio St.2d 88, 90. "The Ohio Constitution establishes the right of the accused to have a 'trial by an impartial jury of the county in which the offense is alleged to have been committed.' Section 10, Article I, Ohio Constitution. R.C. 2901.12 guarantees that right by requiring that a criminal trial shall be held in a court with subject matter jurisdiction in the 'territory of which the offense or any element thereof was committed.' Crim.R. 18 provides that the venue of a case shall be that as set by law." (Internal citations omitted) *State v. Gonzalez*, 188 Ohio App.3d 121, 2010-Ohio-982, ¶4.

{¶ 8} The State need not establish venue with direct evidence. *Headley*, 6 Ohio St.3d at 477. Rather, venue may be established by the totality of the facts and

circumstances of the offense.   Id.

{¶ 9}   Bridgeman did not challenge venue before the trial court, and he cannot raise that issue for the first time on appeal.   E.g., *State v. Cornwell*, Pickaway App. No. 10CA7, 2011-Ohio-1220, ¶5; *State v. Mills*, Williams App. No. WM-09-014, 2010-Ohio-4705, ¶23; *State v. Wheat*, Franklin App. No. 05AP-30, 2005-Ohio-6958, ¶10.   "However, failure to prove venue is a defect affecting a substantial right and is subject to review under the plain error doctrine."   *Cornwell* at ¶5.   "Plain error is to be used 'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'"   *State v. Dixon*, 152 Ohio App.3d 760, 2003-Ohio-2550, ¶21, quoting *State v. Long* (1978), 53 Ohio St.2d 91, paragraph three of the syllabus.

{¶ 10} At trial, the State presented substantial evidence that the robbery of the Christiansburg branch of the First Central National Bank occurred within Champaign County.   State's Exhibit 30 was a map of the southwestern portion of Champaign County, the northwestern portion of Clark County, and eastern Miami County.   The Village of Christiansburg is located in Champaign County, close to the intersection of those three counties.

{¶ 11} Several witnesses placed the Christiansburg branch within the territorial limits of the Village of Christiansburg.   Gary Glaser, a driver for Mike Sells Potato Chips, testified that he drove to the Christiansburg General Store in downtown Christiansburg.   He indicated that the bank was "probably about a block away [from the store] on the other side of the main intersection."   Deputy Nathan Aycock of the Champaign County Sheriff's Office testified that the bank was located at the main intersection of the Village of

Christiansburg. Sgt. Aaron Brown of the Champaign County Sheriff's Office, the lead investigator, stated that he went to the front of the bank "on South Main Street" and he secured the scene by partially blocking the intersection of Main and Pike Streets; Brown explained that Pike Street is the name of State Route 55 within the Village of Christiansburg.

{¶ 12} Although no one expressly testified that the bank was located in Champaign County, the State's evidence established that the bank was located at the intersection of Main and Pike Streets in the Village of Christiansburg, which is within Champaign County. We find no error, plain or otherwise, in the venue of this case.

{¶ 13} Turning to the identity of the bank robber, we find that the State presented sufficient evidence that Bridgeman was the perpetrator of the bank robbery. According to the State's evidence, at approximately 1:20 p.m. on December 17, 2007, a man entered the Christiansburg branch of the First Central National Bank, approached a teller, pointed a gun at her, and demanded that she "put the fucking money into the bag." The man gave the teller plastic bags from Wal-Mart in which to place the money. As the teller filled the bag with money from her station, Branch Manager Doug Mosbarger, who was covering the drive-thru station while another employee was eating lunch, came to the front of the bank. The robber told Mosbarger to get on the floor. Mosbarger was then ordered to get up and get the money from the drive-thru station. Mosbarger returned from the drive-thru station, carrying money in his hands; he placed the money in a plastic bag. The man left the bank with one plastic bag containing $8,218. (In the process of the robbery, another bag of money fell to the floor behind the teller station and was not retrieved by the robber.) The plastic bag taken by the robber included "bait money" (i.e., the serial numbers of the bills

had been recorded), a dye pack, and a $1 bill that set off the bank's alarm.

{¶ 14} Although the bank employees provided varying descriptions of the robber's build and clothing, a surveillance videotape of the robbery revealed that the perpetrator wore a black ski mask with holes for the eyes and mouth, black gloves, a black coat, baggy dark khaki pants, and brown boots. Approximately an hour after the robbery, law enforcement officers recovered a black ski mask, a black coat, two black gloves and two brown boots from the grassy areas along the east and west sides of Alcony Conover Road between State Route 55 and Green Road in Miami County; that location was a few miles away from Christiansburg. That same afternoon, William Davis, a resident of 4040 Alcony Conover Road (between Green Road and Troy Urbana Road) found a pair of pants in his front yard; he contacted the Champaign County Sheriff's Office, which collected the pants from him. Sgt. Brown, who had reviewed the surveillance tape, testified that the clothing was the same as those shown on the surveillance tape.

{¶ 15} Several days after the robbery, the dye pack placed with the money by the bank employees, as well as a DVD and an empty pack of cigarettes, was located outside of a residence on Peters Avenue in Troy. That residence was located in the "same geographical area of the city of Troy" as Bridgeman's residence; Sgt. Brown stated: "If you would divide the city of Troy into four quadrants they were in the same quadrant."

{¶ 16} The items of clothing and the boots were sent to the Ohio Bureau of Criminal Identification and Investigation ("BCI") for DNA testing. BCI selected the ski mask and a glove to test. The ski mask contained DNA from an unknown male, as well as two peaks from a different unknown source. The glove contained a major DNA contributor and a

minor contributor; the major contributor was the same unknown male that was found on the ski mask. Bridgeman was later identified as the unknown male for the ski mask and the major contributor for the glove.

{¶ 17} Sgt. Brown later interviewed Bridgeman regarding the bank robbery. Bridgeman denied any knowledge of a robbery. However, Bridgeman told Brown that he would never hold a gun to someone's face; Brown testified that only law enforcement officers and the perpetrator would know that the teller had been threatened with a gun. Brown further testified that he told Bridgeman that clothing matching the description of the perpetrator had been found scattered along Alcony Conover Road. Bridgeman responded, "You have a ski mask," even though Brown had not told Bridgeman or the media that the perpetrator had worn a ski mask. Bridgeman told Brown that he could not have committed the crime because he was at the Miami County Jail. Brown subsequently spoke to Miami County and learned that Bridgeman was not incarcerated on December 17.

{¶ 18} Construing the evidence in the light most favorable to the State, a reasonable jury could have found, beyond a reasonable doubt, that Bridgeman was the perpetrator of the bank robbery. Bridgeman's DNA was located on clothing that appeared to have been worn by the perpetrator. The dye pack from the robbery was located in the general area of Bridgeman's residence, and Bridgeman made statements to Sgt. Brown that indicated knowledge of the crime beyond the information known by the general public. There was sufficient evidence to support Bridgeman's conviction.

{¶ 19} The second assignment of error is overruled.

II

{¶ 20} Bridgeman's first assignment of error states:

{¶ 21} "THE TRIAL COURT ERRED WHEN IT DID NOT ALLOW THE DEFENDANT TO PERFORM A DEMONSTRATION USING THE STATE'S EXHIBIT."

{¶ 22} At trial, Bridgeman asserted that the boots found along Alcony Conover Road would not fit him, because the boots were size 9½, whereas he wears shoes that are size 10½ or 11. Bridgeman requested permission to try on the boots during his case-in-chief. The State opposed the motion, arguing that "there will be no way to maintain the integrity of the boots for possible evidentiary value should this ever be tried [again] ***[;] I don't believe that the boot could properly be protected from Defendant's contamination of it." The State asserted that Bridgeman's testimony as to his shoe size would be sufficient, that the boots' physical condition may have changed over time (particularly considering they were wet from snow when they were found along Alcony Conover Road approximately one hour after the robbery), and that the State might be confronted with having to ask for a continuance in order to secure the testimony of a podiatrist to explain the manner in which a person's foot size might change. The trial court denied Bridgeman's request to try on the boots.

{¶ 23} Bridgeman argues that the trial court abused its discretion when it precluded him from offering relevant evidence (i.e., a demonstration that the boots were too small) without exploring methods of eliminating possible contamination, such as providing Bridgeman a sterile sock or having Bridgeman wear gloves.

{¶ 24} Relevant evidence is generally admissible whereas irrelevant evidence is not. Evid.R. 402. "Relevant evidence" is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable

or less probable than it would be without the evidence." Evid.R. 401. Relevant evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury. Evid.R. 402; Evid.R. 403(A).

{¶ 25} The admission or exclusion of evidence is left to the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of that discretion. *State v. Sage* (1987), 31 Ohio St.3d 173. An abuse of discretion implies an arbitrary, unreasonable, unconscionable attitude on the part of the trial court. *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, ¶130.

{¶ 26} Whether Bridgeman's foot was too large for the boot allegedly worn by the perpetrator was certainly relevant to whether Bridgeman committed the bank robbery. Were this court to review the issue de novo, we would find Bridgeman's request to try on the boot reasonable. The State had possession of the boots since they were recovered in December 2007, and it had previously tried Bridgeman on these charges using the DNA evidence from the ski mask and glove, but had not specifically requested to have the boots tested for DNA. We see no reason why precautions could not have been taken to prevent the possible transfer of Bridgeman's DNA to the boot should the State (or Bridgeman) desire the boots to be tested in the future. Although this entire issue probably could have been addressed by a motion in limine, we do not find the State's generalized concerns about the need to obtain rebuttal witnesses to be so significant as to warrant the denial of Bridgeman's request.

{¶ 27} Nevertheless, upon reviewing the entirety of the trial transcript, we find any

abuse of discretion in the trial court's decision to be harmless. Bridgeman and two other individuals testified regarding his shoe size. Bridgeman stated that he did not recognize the boots found along Alcony Conover Road (which were size 9½) and that he normally wore size 11 shoes. Patrick Novotney and Steven Nott both testified that they saw Bridgeman wear size 10 shoes at the Tri-County Regional Jail and that they were too small for him. Nott stated that he traded his size 11 loafers for Bridgeman's size 10 loafers, and the size 11 shoes fit Bridgeman. Through this evidence, the jury heard testimony that the boots recovered by the Champaign County Sheriff's Office could not have fit Bridgeman. Moreover, there is the possibility that the boots' condition was affected by their exposure to the snow, and the jury might have had difficulty seeing how far Bridgeman's foot could comfortably extend into the boot. We find no prejudicial error in the court's denial of Bridgeman's request to try on the boots. See, e.g., *State v. Ashley* (C.A.5, 2010), 370 Fed.Appx. 520 (denial of defendant's request to try on clothes was harmless error); *State v. Hutchinson* (La.App. 2002), 817 So.2d 500, 508.

**{¶ 28}** The first assignment of error is overruled.

III

**{¶ 29}** Bridgeman's third assignment of error states:

**{¶ 30}** "APPELLANT'S CONVICTIONS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

**{¶ 31}** In his third assignment of error, Bridgeman claims that his convictions are against the manifest weight of the evidence.

**{¶ 32}** "[A] weight of the evidence argument challenges the believability of the

evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." *State v. Wilson*, Montgomery App. No. 22581, 2009-Ohio-525, ¶12. When evaluating whether a conviction is contrary to the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins*, 78 Ohio St.3d at 387, quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175; *State v. Elmore*, 111 Ohio St.3d 515, 2006-Ohio-6207, ¶44.

{¶ 33} Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson* (Aug. 22, 1997), Montgomery App. No. 16288. However, we may determine which of several competing inferences suggested by the evidence should be preferred. Id.

{¶ 34} The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence. *Wilson* at ¶14. A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin*, 20 Ohio App.3d at 175.

{¶ 35} Bridgeman argues that "[t]his is a case of generic clothing, more than one DNA present, widely different eye witness accounts and no fingerprints." He emphasizes that eyewitnesses gave different descriptions of the robber's physical characteristics and those characteristics did not match him. For example, Glaser, the Mike Sells driver,

testified that he saw a man in attire similar to the robber's around 11:00 or 11:30 a.m. on the day of the robbery; Glaser said the man in a ski mask had brown eyes. The bank teller also testified that the robber had brown eyes. Bridgeman has green eyes. Glaser stated that the black coat was made out of a "wool-type material"; the teller stated that the coat was like a Carhartt coat, which implies a heavy denim material. At trial, the teller recalled that the coat was brown. The coat recovered by the police was black fleece.

{¶ 36} Bridgeman further emphasizes that the ski mask and glove each had DNA from a second individual, and there was no way to determine if Bridgeman was the last person to wear them. The State presented evidence that a suspicious small S-10 truck was near the bank at the time of the robbery; Bridgeman did not own such a truck, and no truck matching that description was located.

{¶ 37} At trial, Bridgeman testified that he was at his home in Troy until 1:00 p.m. on December 17, 2007, which he mistakenly believed was a Saturday, because he did not work that day. (December 17, 2007 was a Monday.) He stated that he left his house around 1:00 p.m. to go to his parents' home in Covington, Ohio, which was about 30-45 minutes away. Bridgeman indicated that he spoke with Sgt. Brown in March 2008, and mistakenly told the officer that he had been in jail at the time of the robbery; Bridgeman later realized that he had been released on December 10, 2007. Bridgeman further testified that his girlfriend had a party at his residence while he was in jail in late November or early December 2007 and that several items "came up missing," including his radio, several pieces of clothing, his work jacket, a ski mask and gloves. Bridgeman stated that the gloves and ski mask that were missing were similar to the ones recovered by the State. Bridgeman

testified the he did not recognize the pants or the boots found by the police, and he did not own those colors of pants and boots.

{¶ 38} Bridgeman acknowledged that he had spoken with Sgt. Brown in March 2008. He stated that he had told Brown that he (Bridgeman) was not violent and would not point a gun at anyone, but he denied saying that he would not point a gun at another person's face. Bridgeman agreed that he had mentioned a ski mask to Brown, but testified that Brown had mentioned the ski mask to him first.

{¶ 39} Bridgeman denied ever owning a gun, owning a pickup truck, having been in Christiansburg in 2007, and knowing the location of the bank. Bridgeman claimed that he did not commit the offenses.

{¶ 40} The State's case against Bridgeman was not overwhelming. Nonetheless, we cannot say that the jury's verdicts were against the manifest weight of the evidence. Upon review of the record as a whole, the jury could have reasonably believed that the clothing located along Alcony Conover Road approximately one hour after the robbery was worn by the perpetrator. Although the bank employees' descriptions of the robber varied, the clothing found on the nearby road was consistent with the clothing seen on the surveillance video. Bridgeman's DNA was the major contributor to the DNA profile found on the ski mask and glove.

{¶ 41} Although the bank teller and Glaser testified that the man in the ski mask had brown eyes, the jury could have elected not to give weight to that testimony, particularly considering the inconsistent descriptions given of the robber. Likewise, the jury could have elected to believe that Bridgeman had worn the boots that were found along Alcony Conover

Road, despite his testimony and the testimony of Nott and Novotney that he wore larger shoes.  In addition, the dye pack was located at a residence on Peters Street in Troy, which Bridgeman testified was a couple of blocks from his house.

{¶ 42} Bridgeman's convictions were not against the manifest weight of the evidence.[2]

{¶ 43} The third assignment of error is overruled.

IV

{¶ 44} Although Bridgeman has not argued on appeal that his convictions should have been merged as allied offenses of similar import, we sua sponte take notice of this error.  See *State v. Jones*, Montgomery App. No. 23926, 2011-Ohio-1984, ¶4 (noticing the potential error of failing to merge allied offenses of similar import).

{¶ 45} The record in this case does not include a transcript of the sentencing hearing, but the judgment entry makes clear that the trial court imposed concurrent sentences of ten years, ten years, and 18 months for the aggravated robbery, the aggravated burglary, and the grand theft charges, respectively.  Those sentences were to run consecutive to the three-year mandatory sentence for the firearm specification in Count One (aggravated robbery), for an aggregate sentence of 13 years.  The court did not impose additional terms for the firearm specifications in Counts Two and Three.

{¶ 46} We have previously held that a trial court's failure to merge allied offenses of similar import constitutes plain error.  *State v. Coffey*, Miami App. No. 2006 CA 6,

---

[2] Although we base our disposition of the third assignment of error on the evidence presented at the second trial, we also concluded in Bridgeman's prior appeal that his convictions were not against the manifest weight of the evidence.  *Bridgeman* at ¶67-76.

2007-Ohio-21, ¶14. See, also, *State v. Puckett* (March 27, 1998), Greene App. No. 97 CA 43. Furthermore, the Ohio Supreme Court has held that "R.C. 2941.25(A) clearly provides that there may be *only one* conviction for allied offenses of similar import. Because a defendant may be convicted of only one offense for such conduct, the defendant may be sentenced for only one offense. Allied offenses of similar import are to be merged at sentencing. *** Thus, a trial court is prohibited from imposing individual sentences for counts that constitute allied offenses of similar import." (Emphasis in original; internal citations omitted) *State v. Underwood*, 124 Ohio St.3d 365, 2010-Ohio-1, ¶26.

{¶ 47} Revised Code 2941.25, Ohio's multiple count statute, provides:

{¶ 48} "(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

{¶ 49} "(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them."

{¶ 50} "R.C. 2941.25 codifies the double jeopardy protections in the federal and Ohio constitutions, which prohibit courts from imposing cumulative or multiple punishments for the same criminal conduct unless the legislature has expressed an intent to impose them. R.C. 2941.25 expresses the legislature's intent to prohibit multiple convictions for offenses which are allied offenses of similar import per paragraph (A) of that

section, unless the conditions of paragraph (B) are also satisfied." *State v. Barker*, 183 Ohio App.3d 414, 2009-Ohio-3511, ¶22, citing *State v. Rance*, 85 Ohio St.3d 632, 1999-Ohio-291, overruled on other grounds by *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314.

{¶ 51} Subsequent to sentencing in this case, the Ohio Supreme Court clarified the process by which courts determine whether offenses are allied offenses of similar import. *Johnson*, supra. The *Johnson* court overruled *Rance* "to the extent that it calls for a comparison of statutory elements solely in the abstract under R.C. 2941.25." *Johnson* at ¶44. Now, "[w]hen determining whether two offenses are allied offenses of similar import subject to merger under R.C. 2941.25, the conduct of the accused must be considered." Id.

{¶ 52} *Johnson* states that "the intent of the General Assembly is controlling." Id. at ¶46. "We determine the General Assembly's intent by applying R.C. 2941.25, which expressly instructs courts to consider the offenses at issue in light of the defendant's conduct." Id. The trial court must determine prior to sentencing whether the offenses were committed by the same conduct. The court no longer must perform any hypothetical or abstract comparison of the offenses at issue in order to conclude that the offenses are subject to merger. Id. at ¶47 "In determining whether offenses are allied offenses of similar import under R.C. 2941.25(A), the question is whether it is possible to commit one offense *and* commit the other with the same conduct, not whether it is possible to commit one *without* committing the other. If the offenses correspond to such a degree that the conduct of the defendant constituting commission of one offense constitutes commission of the other, then the offenses are of similar import." Id. at ¶48 (internal citation omitted).

{¶ 53} "If the multiple offenses can be committed by the same conduct, then the court must determine whether the offenses were committed by the same conduct, i.e., 'a single act, committed with a single state of mind.'" Id. at ¶49 (citation omitted). "If the answer to both questions is yes, then the offenses are allied offenses of similar import and will be merged." Id. at ¶50. "Conversely, if the court determines that the commission of one offense will *never* result in the commission of the other, or if the offenses are committed separately, or if the defendant has separate animus for each offense, then, according to R.C. 2941.25(B), the offenses will not merge." Id. at ¶51.

{¶ 54} Under the facts of this case, it is apparent that the charges of aggravated robbery, aggravated burglary, and grand theft are allied offenses of similar import. The grand theft charge was based on the theft of $8,218; Bridgeman was not accused of stealing anything beyond the money from the bank. The aggravated robbery charge arose from Bridgeman's use of a deadly weapon in committing the grand theft. Bridgeman committed aggravated burglary by trespassing at the bank, by force and with a deadly weapon, while bank employees were present and with the purpose to commit grand theft and/or aggravated robbery. In short, all of the charges stem from Bridgeman's conduct of entering the bank to conduct a robbery, threatening the employees with a firearm, demanding money, and leaving the bank with $8,218. Bridgeman committed multiple offenses through a single course of conduct and with a single state of mind. Therefore, the three counts should have been merged prior to sentencing.

{¶ 55} Where two or more offenses must be merged as allied offenses of similar import, the prosecutor must elect which offense it will pursue. *State v. Harris*, 122 Ohio

St.3d 373, 2009-Ohio-3323, ¶21-23. "If, upon appeal, a court of appeals finds reversible error in the imposition of multiple punishments for allied offenses, the court must reverse the judgment of conviction and remand for a new sentencing hearing at which the state must elect which allied offense it will pursue against the defendant." *State v. Whitfield*, 124 Ohio St.3d 319, 2010-Ohio-2, ¶25. The Supreme Court has provided additional guidance to the trial court, as follows:

{¶ 56} "On remand, the trial court should fulfill its duty in merging the offenses for purposes of sentencing, but remain cognizant that R.C. 2941.25(A)'s mandate that a 'defendant may be convicted of only one' allied offense is a proscription against sentencing a defendant for more than one allied offense. Nothing in the plain language of the statute or in its legislative history suggests that the General Assembly intended to interfere with a determination by a jury or judge that a defendant is guilty of allied offenses. As the state asserts, by enacting R.C. 2941.25(A), the General Assembly condemned multiple sentences for allied offenses, not the determinations that the defendant was guilty of allied offenses.

{¶ 57} "Because R.C. 2941.25(A) protects a defendant only from being punished for allied offenses, the determination of the defendant's guilt for committing allied offenses remains intact, both before and after the merger of allied offenses for sentencing. Thus, the trial court should not vacate or dismiss the guilt determination." (Footnote omitted.) *Whitfield* at ¶26-27.

V

{¶ 58} Bridgeman's convictions will be affirmed. Bridgeman's sentence will be reversed, and the matter will be remanded for resentencing.

. . . . . . . . . .

GRADY, P.J. and HALL, J., concur.

Copies mailed to:

Nick A. Selvaggio
Andrea G. Ostrowski
Hon. Roger B. Wilson