[Cite as *State v. Brown*, 2013-Ohio-2690.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 98881**

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## TONY BROWN

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-560590

**BEFORE:** Rocco, J., Boyle, P.J., and Kilbane, J.

**RELEASED AND JOURNALIZED:** June 27, 2013

**ATTORNEY FOR APPELLANT**

Patrick E. Talty
Suite 512
20325 Center Ridge Road
Rocky River, Ohio 44116

**ATTORNEYS FOR APPELLEES**

Timothy J. McGinty
Cuyahoga County Prosecutor

BY: Adrienne E. Linnick
Assistant Prosecuting Attorney
The Justice Center
1200 Ontario Street
Cleveland, Ohio 44113

KENNETH A. ROCCO, J.:

**{¶1}** Defendant-appellant Tony Brown appeals his convictions for aggravated burglary, aggravated robbery, kidnapping, aggravated theft, and having weapons while under disability in connection with a home invasion. Brown argues that the state presented insufficient evidence of his participation in the home invasion and that his convictions are against the manifest weight of the evidence. In addition, Brown contends that, during her closing argument, the prosecutor mischaracterized the state's DNA evidence, depriving Brown of a fair trial. Having reviewed the record, we find no merit to Brown's arguments. For the reasons set forth below, Brown's assignments of error are overruled, and his convictions are affirmed.

**{¶2}** Brown's convictions arose out of an April 7, 2011 invasion of a home on Selwyn Road in Cleveland Heights. At the time of the incident, Desdemona Sanderfer resided at the home with her 18-year-old nephew, Cedric Sanderfer, and her two daughters, 20-year-old, Desirae Sanderfer, and 7-year-old, M.D. Several masked men, wielding guns, forced their way into the Sanderfer home, then rounded up the family and held them at gunpoint in the basement. The men demanded money and ransacked the house, looking for money they believed was hidden somewhere in the home. Brown's DNA was found on a piece of a torn T-shirt, believed to have been used by one of the intruders as a mask, which was discovered in the family's bathroom following the incident.

{¶3} The state's witnesses, which included all four family members, a family friend, a neighbor, multiple police officers, and several forensic experts, provided the following account of the incident and subsequent events that led to Brown's arrest and convictions.

{¶4} At approximately 7:00 a.m. on April 7, 2011, the home security system was disarmed, and Cedric went outside to the garage at the back of the house to get Desdemona's car, so he could drive her to work. As Cedric was sitting in the driver's seat, getting ready to start the car, the driver's-side door opened. Cedric testified that he saw four males with guns pointed at him, dressed in black, wearing black face masks and hoodies. The men grabbed his arms, pulled him out of the car, and dragged him into the house. The intruders forced him down into the basement where they tied his arms and legs with an electrical cord and forced him to lay on his stomach on the basement floor.

{¶5} Desdemona testified that she was in the dining room collecting her things, getting ready to leave for work, when several men entered the side door of the house, pointing guns at her, calling her names, and screaming at her to get down. Desdemona testified that the intruders were black males and wore black hoodies and white masks. The masks were made from a ripped white T-shirt that covered the bottom part of the intruders' noses, mouths, and necks, like scarves. Desdemona testified that she believed that there were a total of four intruders, but that she never had an opportunity to see them all together. The men took her down into the basement, bound her hands and feet, and forced her to lay on the basement floor facing the wall.

{¶6} Desdemona's daughters, Desirae and M.D., were upstairs in their mother's bedroom when they heard their mother call out, and they knew something was wrong. Desirae testified that she ran out of the bedroom to get a phone to call 911 and was intercepted by an intruder, a man wearing a black hoodie with a white, ripped T-shirt covering his nose and mouth like a scarf. The man placed a gun to Desirae's head and led the two girls downstairs into the basement, where they too were forced to lay on the basement floor with their heads turned toward the wall.

{¶7} While the family was in the basement, the intruders ransacked the home. The men demanded money, repeatedly asking the family "where the money was at," and threatening to kill them if they did not cooperate. Desirae testified that after repeated threats, she offered to show the intruders where some money was located. One of the intruders took Desirae upstairs to her mother's bedroom where she located approximately $6,000 or $7,000 in a dresser drawer, which she gave to one of the men. Because she had not been fully dressed when the gunmen entered the home, Desirae asked if she could put on some clothes, and the intruder took her to her third floor bedroom so she could get dressed. Desirae testified that while she was getting dressed, another intruder joined them upstairs. When she was finished, she and the two intruders headed back downstairs. Desiree testified that when they reached the second floor, one of the men tripped over some clothes in the entryway of one of the second floor bedrooms. He dropped his gun, and his mask came off his face. Desirae testified that the intruder

quickly picked up his gun and told Desirae to turn her head. She did as instructed and was returned to the basement.

{¶8} The incident ended when a family friend, Leslie Slocum, arrived at the house to make sure M.D. made it to school on time. Slocum testified that when she arrived at the house, she noticed that Desdemona's car was still in the garage, which was unusual. She honked the car horn several times. When she got no response, she exited the vehicle and went to the side door, calling for M.D.

{¶9} Slocum testified that as she reached for the doorknob, someone from inside the house grabbed her by the collar. At first believing it was Cedric, playing a joke, she grabbed back, and the man who grabbed her fell on top of her. Slocum testified that he was wearing a white mask with black printing on it. He pointed a gun at her, and she screamed. She heard three men run past her, and the man who had grabbed her got up and ran off as well. The intruders escaped with approximately $6,000 to $7,000 in cash, some jewelry, and the family's cell phones.

{¶10} The family members testified that when they heard Slocum at the side door, the intruders who had been in the basement went upstairs. They heard Slocum scream, then heard footsteps running out the side door. When they were certain the men had left, they untied themselves, and the family went upstairs and exited the house.

{¶11} In addition to testimony from Slocum and the Sanderfer family, the state presented testimony from the family's next door neighbor, Keith Nettles. He testified that when letting his dog out that morning, he heard a female voice in distress. He

looked out his dining room window and saw three or four masked men with guns rushing out of the house, running toward a vehicle parked along the garage at the rear of the house. He testified that he was "almost sure" that he saw four men and was "certain" that they were all wearing "ski masks," but could not provide a further description of the men, other than to state that he saw dark skin on one of the men's hands when he ran out of the house with his gun in the air. Nettles told his wife to call the police and then went outside where he met the family as they were exiting the house. The Cleveland Heights police arrived a few minutes later.

{¶12} The Cleveland Heights police took Desdemona, Cedric, Desirae, and Slocum down to the police station to give statements while they searched the house. The police gathered evidence, including over 75 fingerprints. Detective Josef Burghardt, the lead detective on the case, testified that of the fingerprints that were gathered at the home, only two small partial prints were suitable for comparison. Neither matched Brown. A pry bar, hat, and electric pencil sharpener (which had been reportedly used to tie up the Sanderfer family) were also taken from the scene and submitted for DNA testing.

{¶13} After several hours at the police station, the family returned home, and they, along with Slocum, began cleaning up and packing, preparing to leave the home. As the family was cleaning up, they found a piece of a ripped white T-shirt with black printing on it in the Jacuzzi tub in the second floor bathroom. There was conflicting testimony as to who first found the piece of the T-shirt in the tub. Desdemona testified that she

thought she was the one who found it, but could not recall with certainty whether she or Slocum found the T-shirt. Slocum testified that she found it. Desirae testified that she could not recall who found it. Detective Decaro, who retrieved the T-shirt from the Sanderfer home two days after this incident, testified that Desirae told him that she was the person who found the T-shirt and, at his request, provided a written statement detailing where and when she found the T-shirt. Although there was some disagreement as to who first found the T-shirt, all three women testified that the ripped T-shirt was found in the tub the day of the incident and that they recognized it as one of the masks the intruders had been wearing during the incident. Desirae further testified that the T-shirt did not belong to the family, but rather, "came from the outside." Desdemona testified that she was the only one in the family who had bathed that morning and that she had taken a shower; no one had taken a bath.

{¶14} Desdemona called the Cleveland Heights police and notified them of their discovery. The piece of the T-shirt was placed into a plastic bag, and Detective Decaro picked up the T-shirt from the Sanderfer home on April 9, 2011, two days after the incident. It was thereafter submitted for DNA testing.

{¶15} Four forensic experts testified regarding the DNA testing conducted in the case. Justin Barnhart, a forensic scientist at the Bureau of Criminal Identification and Investigation ("BCI") collected the DNA sample from the T-shirt. He testified that when he received the "rag," it was tied. He testified that he did not untie the T-shirt, but carefully swabbed all exposed areas of the T-shirt on both sides to collect a DNA sample.

He also swabbed the other evidence the police had collected in the case, i.e., the pry bar, hat, and electric pencil sharpener, for DNA.

{¶16} Shawn Weiss, associate technical director of the forensic identity department of Lab Corp., extracted DNA from the sample collected by Barnhart and used it to develop a DNA profile. Weiss testified that the DNA profile showed a mixture from three or more then-unknown individuals. He further testified that the profile consisted of a major contributor, contributing 60 percent or more of the DNA, and at least two other minor contributors, contributing much smaller percentages of the DNA, found in the sample.

{¶17} The DNA profile was run through CODIS, a DNA database. Detective Burghardt testified that he received information that the CODIS system had returned a hit on the DNA from the T-shirt, identifying Brown as a suspect. Detective Burghardt then obtained a sample of DNA from Brown so that it could be compared against the DNA profile from the T-shirt.

{¶18} Kelly Rees, a DNA forensic scientist with BCI, compared the DNA sample obtained from Brown with the DNA profile from the T-shirt. Rees confirmed that the DNA profile showed a mixture from at least three individuals, including a male major contributor. After comparing Brown's DNA with the DNA profile from the T-shirt, Rees concluded that Brown's DNA matched the major DNA contributor from the T-shirt. She testified that such a match would occur only once in 117 sextillion individuals.

{¶19} Chris Smith, another DNA forensic scientist at BCI, analyzed the DNA obtained from the other evidence taken from the Sanderfer home. He testified that the pry bar and pencil sharpener contained DNA from two unidentified individuals, at least one of whom was male, and that the hat contained DNA from at least three individuals. He further testified that Brown was not a contributor to the DNA found on the pry bar or pencil sharpener, and that the results were inconclusive as to whether Brown's DNA was present on the hat.

{¶20} After receiving the results of the DNA testing linking Brown to the home invasion, Detective Burghardt contacted the Sanderfer family and scheduled a photo lineup that included Brown. Desdemona, Desirae, and Cedric each viewed the photo lineup but could not identify Brown — or anyone else in the lineup — as one of the intruders.

{¶21} Brown was arrested on March 6, 2012, and on March 19, 2012, he was indicted on eleven counts — two counts of aggravated burglary in violation of R.C. 2911.11(A)(1) and (A)(2); one count of aggravated robbery in violation of R.C. 2911.01(A)(1); one count of felonious assault in violation of R.C. 2903.11(A)(2); five counts of kidnapping in violation of R.C. 2905.01(A)(2); one count of aggravated theft in violation of R.C. 2913.02(A)(1); and one count of having weapons while under disability in violation of R.C. 2923.12(A)(3). Nine of the eleven counts included one-year and three-year firearm specifications under R.C. 2941.141. The case proceeded to a jury

trial on the first ten counts; the eleventh count, having weapons while under a disability, was bifurcated and tried to the bench.

{¶22} At the conclusion of the state's case, Brown moved for acquittal on all charges. The court denied the motion. Brown then rested without presenting any witnesses. On August 6, 2012, Brown was found guilty on all counts except the felonious assault count. As to the felonious assault charge, the jury returned a verdict of not guilty. On August 15, 2012, the trial court sentenced Brown to an aggregate prison term of 31 years for the offenses of which he had been convicted.

{¶23} Brown appeals his convictions, raising three assignments of error:

ASSIGNMENT OF ERROR NO. I:
The trial court erred in denying appellant's motion for acquittal where the evidence is not sufficient to support conviction.

ASSIGNMENT OF ERROR NO. II:
The verdict of the court finding defendant-appellant guilty is against the manifest weight of the evidence.

ASSIGNMENT OF ERROR NO. III:
The trial court erred in permitting the prosecution's comments concerning

DNA during closing arguments.

**Sufficiency and Manifest Weight of the Evidence**

{¶24} In his first and second assignments of error, Brown contends that the trial court erred in denying his Crim.R. 29 motion for acquittal and that his convictions are against the manifest weight of the evidence. Although they involve different standards of review, because they involve interrelated issues, many of the same arguments, and a

review of the same evidence, we address Brown's first and second assignments of error together.

**{¶25}** A Crim.R. 29(A) motion for acquittal tests the sufficiency of the evidence. *State v. Hill*, 8th Dist. No. 98366, 2013-Ohio-578, ¶ 13. Accordingly, we review a trial court's denial of a defendant's motion for acquittal using the same standard we apply when reviewing a sufficiency-of-the-evidence claim. *Id.*

**{¶26}** A challenge to the sufficiency of the evidence supporting a conviction requires a determination of whether the state has met its burden of production at trial. *State v. Hunter*, 8th Dist. No. 86048, 2006-Ohio-20, ¶ 52. When reviewing sufficiency of the evidence, an appellate court must determine "'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. In a sufficiency inquiry, an appellate court does not assess whether the state's evidence is to be believed, but whether, if believed, the evidence admitted at trial supported the conviction. *State v. Starks*, 8th Dist. No. 91682, 2009-Ohio-3375, ¶ 25, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541; *Jenks* at paragraph two of the syllabus. If the evidence is sufficient to support a conviction as a matter of law, the appellate court then considers the claim that the verdict was against the manifest weight of the evidence. This test is much broader.

{¶27} When considering an appellant's claim that a conviction is against the manifest weight of the evidence, the reviewing court sits as a "'thirteenth juror'" and may disagree "with the factfinder's resolution of conflicting testimony." *Thompkins* at 387, quoting *Tibbs v. Florida*, 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). The reviewing court cannot merely substitute its judgment for that of the trial court but must examine the entire record, weigh the evidence and all reasonable inferences, consider the witnesses' credibility, and determine whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). In conducting such a review, this court remains mindful that the credibility of witnesses and the weight of the evidence are matters primarily for the trier of fact to assess. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraphs one and two of the syllabus. The power to reverse a conviction as against the manifest weight of the evidence must be exercised with caution. Reversal of a conviction as being against the manifest weight of the evidence is granted only in the most "exceptional case in which the evidence weighs heavily against the conviction." *Martin*, *supra*.

{¶28} Brown's challenges to his convictions are limited to the element of identity. Brown argues that his convictions should be overturned because "there is simply no evidence" that Brown "was present in the Sanderfer home when the crimes for which he was charged were committed." Because he does not contend that the state failed to

establish any of the other elements of the crimes for which he was convicted, we limit our analysis to whether the evidence was sufficient to establish, beyond a reasonable doubt, that Brown was one of the intruders who participated in the April 7, 2011 home invasion.

**{¶29}** Brown argues that the state presented insufficient evidence regarding his participation in the home invasion and that his convictions were against the manifest weight of the evidence because: (1) none of the victims or investigating police officers could identify Brown "as being present" during the home invasion or "known to the Sanderfer family," (2) the "only evidence connecting him to these crimes" was the presence of his DNA on a piece of cloth that included the DNA of at least two other individuals, and (3) there was conflicting witness testimony as to who found the T-shirt and when it was found. **{¶30}** It is well settled that, in order to support a conviction, the evidence must establish beyond a reasonable doubt the identity of the defendant as the person who actually committed the crime at issue. *State v. Collins*, 8th Dist. No. 98350, 2013-Ohio-488, ¶ 19, citing *State v. Lawwill*, 12th Dist. No. CA2007-01-014, 2008-Ohio-3592, ¶ 11. However, there is no requirement that the defendant must be identified as the perpetrator by a witness testifying in court or during a photo lineup. *Id.*; *State v. Miller*, 11th Dist. No. 2011-L-111, 2012-Ohio-3515, ¶ 53. Numerous courts, including this court, have recognized that direct or circumstantial evidence is sufficient to establish the identity of the defendant as the person who committed the crime. *See, e.g., Miller, supra*; *Collins, supra*; *Lawwill, supra*; *State v. Williams*, 10th Dist. No. 10AP-779, 2011-Ohio-4760, ¶ 22-25. "Circumstantial evidence" is "the proof of facts by direct

evidence from which the trier of fact may infer or derive by reasoning other facts." *Lawwill* at ¶ 12, citing *State v. Wells*, 12th Dist. No. CA2006-02-029, 2007-Ohio-1362, ¶ 11. Circumstantial evidence has no less probative value than direct or testimonial evidence. *State v. Primeau*, 8th Dist. No. 97901, 2012-Ohio-5172, ¶ 30, citing *Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492, at paragraph one of the syllabus; *see also State v. Cassano*, 8th Dist. No. 97228, 2012-Ohio-4047, ¶ 13-15 (observing that the Ohio Supreme Court "has 'long held that circumstantial evidence is sufficient to sustain a conviction if that evidence would convince the average mind of the defendant's guilt beyond a reasonable doubt'"), quoting *State v. Heinish*, 50 Ohio St.3d 231, 238, 553 N.E.2d 1026 (1990). Accordingly, the fact that none of the members of the Sanderfer family could identify Brown as one of the masked intruders in court or during the photo lineup does not, in and of itself, warrant a conclusion that the verdict was based on insufficient evidence or was against the manifest weight of the evidence.

{¶31} Likewise, the fact that the DNA profile on the T-shirt was a mixture of major and minor contributors, including, in addition to Brown's DNA (as the major contributor), the DNA of at least two other, unidentified individuals (as minor contributors), does not warrant overturning Brown's convictions. It is undisputed that a group of men participated in the home invasion. The state's forensic scientists testified that if a person touches an item, he or she may leave DNA on the item. Smith further testified that with clothing, in particular, it is not uncommon for multiple people to touch an article of clothing, leaving their DNA on the item. Accordingly, under the

circumstances, it would not be unreasonable to find DNA from more than one person, as minor contributors, on the T-shirt.

{¶32} Brown further argues that because there there was "no testimony as to how old this DNA was or how this item may have been brought into the Sanderfer home," "[i]t is anybody's guess as to how or when this item ended up in the Sanderfer home," and that the presence of his DNA on the T-shirt, therefore, was insufficient to establish that Brown was present in the Sanderfer home at the time of the invasion. We disagee. Brown claims that he could have left his DNA on the T-shirt at any time, "days or even weeks prior to the time [the T-shirt] was found at the Sanderfer home." However, it is undisputed that the Sanderfer family did not know or recognize Brown. Further, Desirae testified that the T-shirt was not something that belonged to the family and that it came from outside the house. Given his lack of connection to the Sanderfer family, there would be no reason a ripped T-shirt containing Brown's DNA would be present in the Sanderfer home. No reasonable, alternative explanation was offered as to how or why a piece of a ripped T-shirt, similar to the masks worn by the intruders, containing Brown's DNA would suddenly show up in the Sanderfers' tub after the incident.

{¶33} In this case, the jury did not need to "guess" as to how the T-shirt "ended up in the Sanderfer home." Based on the testimony from the state's witnesses that: the ripped T-shirt was found in the tub in the second floor bathroom after the incident; the T-shirt did not belong to the family; one of the intruders had lost a mask on the second floor during the incident; and the ripped T-shirt appeared to be one of the masks worn by

the intruders, the trier of fact could reasonably conclude that the T-shirt was a mask worn by one of the intruders that had been left behind when the intruders rushed out of the Sanderfer home. The trier of fact could also reasonably conclude, based on the witness testimony and the scientific evidence establishing that (1) Brown's DNA matched the major contributor on the DNA profile from the T-shirt and (2) such a match would occur only once in 117 sextillion individuals, that Brown had worn the mask, and was one of the men who participated in the home invasion.

{¶34} In a further attempt to minimize the significance of the DNA evidence, Brown contends that "several forensic scientists" testified at trial that the DNA found on the T-shirt was "touch DNA," i.e., DNA that could have been "left behind" by Brown when he touched or otherwise came into contact with the T-shirt at any time. As a result, Brown argues, the presence of his DNA on the T-shirt cannot establish, beyond a reasonable doubt, his presence in the Sanderfers' home at the time of the home invasion. However, a review of the record does not support Brown's claims. Although Smith testified that the DNA collected from the items listed in his report was "probably touch evidence," Smith's analysis of the DNA evidence was limited to the hat, pry bar, and pencil sharpener. Weiss and Rees analyzed the DNA found on the T-shirt. Barnhardt, who swabbed the evidence for DNA, opined that DNA found on the evidence he swabbed was likely "touch evidence" or saliva. Rees testified that the T-shirt was not tested for bodily fluids and that, therefore, the source of the DNA on the T-shirt, i.e., whether it

came from bodily fluids such as saliva or sweat or was "touch DNA" resulting from physical contact with the T-shirt, was unknown.

{¶35} Even if the DNA on the T-shirt was "touch DNA," the state's forensic experts testified that the longer an individual is in contact with an item, the greater the likelihood that the individual will leave behind a larger quantity of DNA. They likewise testified that greater quantities of DNA are typically found when the source of the DNA is a bodily fluid, such as sweat, blood, or saliva. Based on this evidence, the jury could have reasonably concluded that the significantly higher amounts of DNA on the T-shirt matching Brown as the major DNA contributor (as compared with the lesser quantities of DNA from the other, unidentified, minor DNA contributors) meant that Brown had been in contact with the T-shirt for a much greater time, e.g., such as by wearing the T-shirt, or that the source of his DNA on the T-shirt was from a bodily fluid, such as sweat or saliva, either of which could have occurred if Brown had been wearing the T-shirt as a mask during the home invasion.

{¶36} Brown also contends that there was insufficient evidence to support his convictions because the witnesses' testimony was "materially different" regarding who found the ripped T-shirt and when it was found. He also takes issue with the witnesses' testimony regarding the number of intruders and the amount of cash that was allegedly taken from the home during the incident. He further claims that the T-shirt recovered by the Sanderfer family after the incident could not have been a mask worn by one of the

intruders because the Sanderfers' neighbor, Keith Nettles, testified that all of the intruders he saw were wearing masks when they ran away from the house.

**{¶37}** Admittedly, there were some inconsistencies among the testimony of the witnesses. For example, while M.D. testified that she saw five intruders, other family members, along with Nettles and Slocum, believed that only four men were involved. There was also conflicting testimony as to precisely how much cash was stolen from the home during the incident. With respect to the timing and identity of the person who found the T-shirt, although there was conflicting testimony from the witnesses as to who initially found the T-shirt — i.e., Desdemona originally thought she was the one who found the T-shirt, then testified she could not recall whether she or Slocum found the T-shirt; Slocum testified that she found it; Detective Decaro testified that Desirae told him that she had found it — it is undisputed that the family was working together, packing and cleaning up the house, when the T-shirt was discovered. This may explain why there is some variation among the witnesses' testimony as to who actually found the T-shirt. Desdemona, Desirae, and Slocum, however, all testified consistently that the T-shirt was found in the tub in the second floor bathroom when the family returned to the house the day of the incident and that the T-shirt appeared to be one of the masks worn by the intruders.

**{¶38}** The mere existence of conflicting evidence "cannot make the evidence insufficient as a matter of law." *State v. Murphy*, 91 Ohio St.3d 516, 543, 747 N.E.2d 765 (2001). Likewise, "[a] conviction is not against the manifest weight of the

evidence solely because the jury heard inconsistent testimony." *State v. Wade*, 8th Dist. No. 90029, 2008-Ohio-4574, ¶ 38, quoting *State v. Asberry*, 10th Dist. No. 04AP-1113, 2005-Ohio-4547, ¶ 11; *see also State v. Mann*, 10th Dist. No. 10AP-1131, 2011-Ohio-5286, ¶ 37 ("'While [a factfinder] may take note of the inconsistencies and resolve or discount them accordingly, * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence.'"), quoting *State v. Nivens*, 10th Dist. No. 95APA09-1236, 1996 Ohio App. LEXIS 2245, *7 (May 28, 1996); *State v. Bridgeman*, 2d Dist. No. 2010 CA16, 2011-Ohio-2680, ¶ 35-42 (fact that evidence "is subject to different interpretations does not render the conviction against the manifest weight of the evidence"), citing *State v. Wilson*, 2d Dist No. 22581, 2009-Ohio-525, ¶ 14.

**{¶39}** The trier of fact was in the best position to weigh the evidence and the witnesses' credibility. A trier of fact may believe or disbelieve all, part, or none of a witness's testimony. Accordingly, any inconsistencies in the witnesses' testimony regarding how many intruders there may have been, the amount of money that was taken from the home, whether all the intruders had masks on when they left the house, or who first found the T-shirt when the family was cleaning and packing up after the incident, does not warrant the conclusion that Brown's convictions were not supported by sufficient evidence or were against the manifest weight of the evidence.

**{¶40}** Viewing the evidence in a light most favorable to the prosecution, we conclude that a rational jury could have determined, beyond a reasonable doubt, that

Brown was one of the intruders. The testimony of the witnesses along with the DNA evidence was sufficient to establish Brown as one of the intruders.

{¶41} We likewise find no merit to Brown's assertion that the jury's verdict was against the manifest weight of the evidence. In support of his claim that his convictions were against the manifest weight of the evidence, Brown relies on the same argument he raised in support of his sufficiency challenge, i.e., that the evidence does not support the determination, beyond a reasonable doubt, that he was one of the intruders.

{¶42} Although nothing in the state's case directly proved that Brown was one of the participants in the home invasion, the state's evidence could well have convinced the jury that "the application of various facts formed a larger picture that, when viewed as [a] whole, made a compelling case for [Brown's] guilt." *Cassano*, 2012-Ohio-4047, at ¶ 19. As detailed above, in this case, the state's witnesses presented credible, consistent testimony establishing that the T-shirt found in the Sanderfers' tub shortly after the incident was one of the masks worn by the intruders. *State v. Wilson*, 8th Dist. No. 90267, 2008-Ohio-3354, ¶ 34-35. DNA evidence also supported Brown's convictions, connecting him to the invasion of the Sanderfers' home. Other courts have upheld convictions where similar DNA evidence links the defendant to the crime scene. *See, e.g., State v. Crabtree*, 9th Dist. No. 24946, 2010-Ohio-2073 (evidence was sufficient to establish defendant was perpetrator in home invasion where the major DNA profile found on gun used at the crime scene was consistent with defendant and victim testified regarding contact with intruder); *State v. Johnson*, 5th Dist. No. 2012 CA 00054,

2012-Ohio-5621, ¶ 25 (although victim was unable to identify defendant as one of the men who robbed him, evidence of defendant's DNA on ball cap, which was identified by victim as the one the robber wore, and in spit found in area where the robbers retreated was sufficient to convict defendant); *State v. James*, 5th Dist. No. 11CAA050045, 2012-Ohio-966, ¶ 23-24 (affirming conviction for burglary where evidence linking defendant to the crime scene consisted of defendant's DNA on a discarded cigarette butt and the condition of the cigarette butt indicated that it had been left recently); *Bridgeman*, 2011-Ohio-2680 at ¶ 35-42 (evidence supported convictions arising out of bank robbery where defendant's DNA was located on clothing that appeared to have been worn by the robber, notwithstanding that clothing also contained DNA from another individual and eyewitnesses gave differing descriptions of robber); *Williams*, 2011-Ohio-4760 at ¶ 22-25 (lack of positive identification of defendant did not warrant reversal of convictions for robbery, aggravated robbery, and kidnapping where witnesses testified that one of the robbers wore a blue mask and defendant's DNA was found on a blue mask in a car used to flee the scene of the robbery).

{¶43} After examining the entire record, we cannot say that the jury lost its way or created a manifest miscarriage of justice in convicting Brown. The state's case contained ample evidence upon which the jury could reasonably conclude, beyond a reasonable doubt, that Brown was one the intruders. Accordingly, we overrule Brown's first and second assignments of error.

**Prosecutorial Misconduct**

**{¶44}** In his third assignment of error, Brown argues that the prosecutor's comments, during closing argument, regarding the strength and consistency of the DNA evidence in the case constituted prosecutorial misconduct and deprived Brown of his right to a fair trial. Once again, we disagree.

**{¶45}** As the Ohio Supreme Court has explained, prosecutors are entitled to "wide latitude" in their closing arguments:

> "The test regarding prosecutorial misconduct in closing arguments is whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant." *State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984). Prosecutors are granted wide latitude in closing argument, and the effect of any conduct of the prosecutor during closing argument must be considered in light of the entire case to determine whether the accused was denied a fair trial. *State v. Maurer*, 15 Ohio St.3d 239, 266, 269, 473 N.E.2d 768 (1984). The touchstone of the analysis "is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 149.

Accordingly, an appellate court should reverse a conviction on grounds of prosecutorial misconduct only if the effect of the misconduct "permeates the entire atmosphere of the trial," such that the defendant has been denied a fair trial. *State v. Singleton*, 8th Dist. No. 98301, 2013-Ohio-1440, ¶ 57-58, citing *State v. Tumbleson*, 105 Ohio App.3d 693, 696, 664 N.E.2d 1318 (12th Dist.1995). No such misconduct occurred in this case.

**{¶46}** Brown contends that the prosecutor improperly characterized the DNA evidence in the case, thereby prejudicing Brown, by making the following statement during her closing argument:

*[L]adies and gentlemen, the testimony that you heard is that DNA*

*from that T-shirt in the Sanderfer home matched to Tony Brown.*

*No explanation, no guessing, \* \* \* no alternative theories as to*

*whose DNA could it be*, could we have been wrong, could we have

tested it wrong. No. You heard straight evidence from these

forensic scientists that they followed the procedures that they are

held to do, that they do in their every day job and that tested to Tony

Brown. (Emphasis added.)

**{¶47}** Brown does not explain why he believes the prosecutor's comments were improper or prejudicial, but he presumably contends that the prosecutor's statements that the DNA on the T-shirt "matched Tony Brown" and that there could be "no guessing" and "no alternative theories as to whose DNA it could be" were a mischaracterization of the evidence given that it was undisputed that DNA from at least two other unidentified individuals was also found on the T-shirt. However, it is well recognized that a prosecutor may comment in closing argument regarding "'what the evidence has shown and what reasonable inferences [the prosecutor] believes may be drawn therefrom.'" *State v. Lott*, 51 Ohio St.3d 160, 165, 555 N.E.2d 293 (1990), quoting *State v. Stephens*, 24 Ohio St.2d 76, 82, 263 N.E.2d 773 (1970); *State v. Tufts*, 8th Dist. No. 94276, 2011-Ohio-73, ¶ 23. A prosecutor's comments are not to be taken out of context and given their "'most damaging meaning.'" *State v. Fether*, 5th Dist. No. 2011-CA-00148,

2012-Ohio-892, ¶ 64, quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 647, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974).

{¶48} In this case, the prosecutor's remarks were based upon undisputed evidence that Brown's DNA matched the major contributor on the DNA profile from the T-shirt and that such a match would occur only once in 117 sextillion individuals. The prosecutor's remarks were made in the context of assessing the reasonableness and reliability of the conclusions reached by the forensic science experts in evaluating the DNA evidence in this case, e.g., "could we have been wrong," "could we have tested it wrong," were the proper procedures followed. Under the circumstances, the prosecutor's remarks regarding the extent to which DNA from the T-shirt matched Brown's DNA constituted "fair comments" on the DNA evidence presented in the case. *State v. Triplett*, 8th Dist. No. 97522, 2012-Ohio-3804, ¶ 48; *State v. McKnight*, 107 Ohio St.3d 101, 2005-Ohio-6046, 837 N.E.2d 315, ¶ 289. Simply because Brown disputes the state's interpretation of the significance of the DNA evidence does not mean the prosecutor's remarks were improper or constituted prosecutorial misconduct. *See, e.g., State v. McClurkin*, 10th Dist. No. 11AP-944, 2013-Ohio-1140, ¶ 21. Brown had his opportunity, in his closing argument, to offer his own interpretation of the DNA evidence and did so, arguing that "we got half the story from [the prosecutor] that it was the DNA to Tony Brown * * * but we didn't get the second part of that which you got on the stand * * * [that] the DNA profile from the shirt is a mixture consistent with contributions from Tony Brown and at least two unknown individuals."

{¶49} Brown has not shown that the prosecutor's comments were improper or prejudicial or deprived Brown of a fair trial. Accordingly, Brown's third assignment of error is overruled.

{¶50} Brown's convictions are affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentences.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
KENNETH A. ROCCO, JUDGE

MARY J. BOYLE, P.J., and
MARY EILEEN KILBANE, J., CONCUR