[Cite as *State v. Mooty*, 2014-Ohio-733.]

## IN THE COURT OF APPEALS OF OHIO
### SECOND APPELLATE DISTRICT
### MONTGOMERY COUNTY

STATE OF OHIO

      Plaintiff-Appellee

v.

MICHELLE D. MOOTY

      Defendant-Appellant


Appellate Case No.    25669

Trial Court Case No.   2011-CR-4171/2


(Criminal Appeal from
  Common Pleas Court)

. . . . . . . . . . .

# **O P I N I O N**

Rendered on the 28th day of February, 2014.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by APRIL F. CAMPBELL, Atty. Reg. No. 0089541, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, P.O. Box 972, 301 West Third Street, Dayton, Ohio 45422
      Attorney for Plaintiff-Appellee

MICHAEL C. THOMPSON, Atty. Reg. No. 0041420, 5 North Williams Street, Dayton, Ohio 45402
      Attorney for Defendant-Appellant

. . . . . . . . . . . . .

WELBAUM, J.

**{¶ 1}** The State alleged that Michelle D. Mooty's boyfriend, Joe Watson, beat Mooty's two year old son, Levi, to death after a lengthy ordeal of terrible abuse. The State presented evidence of Mooty's culpability, arising from Mooty's actions in giving Watson frequent access to Levi, even though she was increasingly aware of the abuse and had available alternative means and support to avoid it.

**{¶ 2}** We are asked to determine whether there was sufficient evidence to support the jury's verdict of guilty, whether the verdict was against the manifest weight of the evidence, and whether the trial court erred at sentencing when it decided to not merge the counts as allied offenses. After considering Mooty's arguments and the record, we affirm the judgment of the trial court.

## I.  COURSE OF PROCEEDINGS

**{¶ 3}** On December 16, 2011, Mooty was charged by indictment with Permitting Child Abuse (recklessly causing death); Complicity to Commit Felonious Assault (knowingly and serious harm); and Endangering Children (recklessly by a parent with serious harm), in violation of  R.C.  2903.15(A),  2903.11(A)(1)/2923.03,  and 2919.22(A).  The three offenses span progressively overlapping date ranges towards the end of Levi's life, with each offense date ending on the date of Levi's death.

**{¶ 4}** A jury convicted Mooty of all three offenses. First, Mooty was convicted of Permitting Child Abuse, a felony of the first degree, for allegedly recklessly causing the death of Levi as a proximate result of permitting child abuse (abuse, torture, corporal punishment, or physical restraint), in violation of  R.C. 2903.15(A), on or about  December 7-8, 2011.  The trial court sentenced Mooty to a term of six years in prison on this count.

{¶ 5}   Mooty was also convicted of Complicity to Commit Felonious Assault by knowingly aiding and abetting another, a felony of the second degree, in violation of R.C. 2903.11(A)(1) and 2923.03(A)(2), on or about December 4-8, 2011. The trial court sentenced Mooty to 4 years in prison on this count.

{¶ 6}   Thirdly, the jury found Mooty guilty of Endangering Children by recklessly creating a substantial risk to the health and safety of Levi by violating a duty of care, protection, or support, resulting in serious physical harm, a felony of the third degree in violation of R.C. 2919.22(A), on or about July 1 to December 8, 2011.   The trial court sentenced Mooty to a term of 24 months in prison on this count.

{¶ 7}   The trial court ordered the sentences to be served consecutively, for an aggregate prison sentence of 12 years.   In addition, the trial court found that Mooty was convicted of three separate acts, all ending at the same time.   Transcript of Trial Proceedings, p. 684.   At the time of sentencing, Mooty did not argue that the offenses should merge.

{¶ 8}   Mooty presents four assignments of error, claiming that the trial court erred: (1) in failing to merge allied offenses; (2) in imposing consecutive sentences; (3) by   entering judgment in light of the insufficiency of the evidence; and (4) by entering judgment against the manifest weight of the evidence.

## II.  FACTS

{¶ 9}   The briefs of the parties accurately summarize the evidence.  On December 8, 2011, at 9:44 a.m., a nervous Joe Watson came into the emergency room at Good Samaritan hospital, carrying a lifeless two-year-old boy named Levi.  Transcript of Trial Proceedings, pp. 227-30, 234, and 245.  Levi was pronounced dead only 14 minutes later.  *Id.* at p. 245.  Levi's

death was classified as a homicide, with his cause of death being multiple blunt force trauma. *Id.* at p. 217. Joe Watson subsequently pled guilty to murder and three counts of child endangering. *See State v. Watson*, Montgomery C.P. No. 2011 CR 4171/1.

{¶ 10} Mooty's case was tried to a jury. The evidence at Mooty's trial established that Mooty is the mother of four children: D.B., K.B., Levi, and G.W. Transcript of Trial Proceedings, p. 364. Charles Barrett is the biological father of K.B., age four, and Levi, age two. *Id.* at p. 317.

{¶ 11} Prior to her relationship with Joe Watson, Mooty was involved in a relationship with Charles that lasted for about five years. Their relationship ended in 2010. *Id.* at p. 400. Even though Mooty and Charles were no longer together, Charles kept in contact with both K.B. and Levi. *Id.* at pp. 320-24 and 408. Charles saw K.B. and Levi constantly on weekends, until he moved to Columbus in July 2011. *Id.* at pp. 402 and 408.

{¶ 12} Stacy Hines, Levi's aunt, kept in close touch with both Levi and K.B., and with Levi, in particular, until he died. *Id.* at pp. 377, 320, and 324. Stacy kept Levi whenever Mooty asked, and Mooty also let Stacy keep Levi whenever Stacy wanted her nephew to stay over. *Id.* at p. 320. As a two-year-old, Levi could say basic names, and point to the things he needed, but could not speak in complete sentences or change his own clothes. *Id.* at pp. 327 and 331. Thus, when Levi was in Stacy's care, Stacy bathed him and bought clothes for him. *Id*. at p. 340.

{¶ 13} Mooty began dating Joe Watson sometime prior to July 2011. *Id*. at p. 402. It was a relationship that both Charles and Stacy knew about. *Id.* at pp. 324-25, 365, and 402. Mooty and her children lived with Joe Watson at Joe's mother's house on Shoop Avenue in Dayton; Mooty also lived with her mother at times, on Blackwood Avenue on the east side of Dayton. *Id.* at pp. 326 and 362; State's Ex. 89A.

{¶ 14}   In the early part of July 2011, Charles Barrett became aware of a bruise that Levi sustained to his ear.   Transcript of Trial Proceedings, p. 401.   Charles was on his way to pick up his two children from Mooty, when Mooty called him.   *Id.*   Mooty told Charles over the phone that she did not want him to be upset when he saw Levi.   *Id.*   Mooty said that Levi had a bruise behind his ear.   *Id.* She explained that Levi received the bruise when he fell on the playground, and that he had hit the back part of his head on the slide.   *Id.*   Charles reported the injury to Montgomery County Children Services, and spoke to a Children Services' employee named Julia Granger, but no one ever contacted Charles again about the incident.   *Id.*   Charles then moved to Columbus that month.   *Id.* at p. 402.   The last time Charles saw Levi was the week before he left in July 2011.   *Id.*   Charles had planned to see his children after that, and arranged to have them over the Thanksgiving holiday in November 2011.   *Id.* at pp. 402-03. However, when Charles drove down to pick up the children, Mooty refused to let Charles see them.   *Id.* at p. 403.

{¶ 15}   On September 20th, 2011, Stacy went to pick up Levi.   *Id*. at p. 331.   When Stacy arrived, Mooty brought Levi out to her.   *Id.* at p. 331.   Levi was wearing an oversized t-shirt, shorts, and some shoes. *Id.*   Stacy noticed how dirty Levi was, like he had been playing outside all day long.   *Id.* at p. 332.   Levi's face was a mess.   *Id.* at p. 333.   Levi smelled, and he was wearing a soiled diaper, with feces in it that looked old.   *Id.* at p. 332.   His odor was overwhelming.   *Id.* at p. 333.   Stacy decided to bathe Levi as soon as she got him to her home. *Id.* at p. 331.

{¶ 16}   While bathing Levi, Stacy noticed bruises and marks on Levi's body that were plainly visible once Levi was clean.   *Id.* at pp. 330 and 336.   Stacy saw bruises on Levi's face and cheek.   *Id.* at pp. 329 and 333.   Levi had a bruise on his arm, and bruises on the folds of the back of his legs.   *Id.* at p. 333.   Levi also had scratches on the bends of his knees.   *Id.* at p. 329.

Levi's scratches looked like they were a little infected; they were red and pussy. Id. at p. 333. In Stacy's estimation, Levi's bruises were not normal at all. *Id.* at p. 329. Because Levi's injuries aroused her suspicion, Stacy called Mooty to talk to her about them once she got Levi cleaned up. *Id.* at pp. 329 and 333.

{¶ 17} Stacy told Mooty about the bruises she saw on Levi, and asked Mooty for an explanation. Transcript of Trial Proceedings, p. 330. Mooty responded by explaining that Levi was with Joe, and that she had not seen these bruises. *Id.* Consequently, Stacy took photographs of Levi's injuries with her cell phone and sent them by text to Mooty. *Id.* at p. 333. Stacy took several pictures of the injuries on Levi's legs, and a picture of the bruise on his face. *Id.* at pp. 334-36. Stacy called Mooty afterward and asked her if she received the photographs. *Id.* at p. 337. Mooty replied that she did. *Id.* Mooty explained that Levi had been with Joe, and that she did not know how Levi got those injuries. *Id.*

{¶ 18} While Stacy was speaking with Mooty, Stacy could hear Watson in the background of the phone call. *Id.* at p. 338. Watson sounded angry, because Mooty had asked him about the bruises. *Id.* Watson called Stacy a liar, and said that Levi did not have any bruises. *Id.* Watson then called Stacy a bitch, and said again that she was lying. *Id.* Mooty told Stacy that she would never hit her kids. *Id.* Stacy could hear the conversation continuing between Mooty and Watson, and heard him say that Levi could have fallen on a glass table, that Levi played rough with the dogs, and that this was how the bruising could have happened. *Id.*

{¶ 19} Stacy did not call the police. *Id.* Stacy thought that if she brought Levi's bruises to Mooty's attention, it would not happen again. *Id.* at p. 339. Subsequently, Stacy had another conversation with Mooty, in which Mooty informed her that she was moving back in with her mother. *Id.* This made Stacy feel better. *Id.* Stacy kept Levi until the early part of October,

when Mooty wanted Levi back for his birthday. *Id.* at p. 349. During that time, Mooty did not come to visit Levi, nor did she ask about his bruises beyond Stacy's initial call about them. *Id.* at p. 350. The last time Stacy saw Levi was around the beginning of November, when she brought clothes to Mooty for Levi. *Id.* at p. 341.

{¶ 20} A month later, on November 18, 2011, Montgomery County Children Services received a referral about a domestic violence incident that had occurred between Mooty and Joe Watson in mid-October 2011. Transcript of Trial Proceedings, p. 362. lt was an emotional maltreatment referral, which means that the children had been exposed to a domestic violence event, which could be emotionally traumatizing. *Id.* at p. 366. James Turner, a Montgomery County Children Services employee, was assigned to the case. *Id.* at p. 362. Turner's job was to determine whether the referral could be substantiated. *Id.* at p. 360. Turner attempted to make an unannounced face-to-face contact with Mooty and her children at Mooty's listed address on Blackwood Avenue, but could not get in the building to knock on Mooty's apartment door. *Id.* at p. 363. Turner then called and scheduled a home visit for November 29, 2011. *Id.*

{¶ 21} November 29th was eight days before Levi died. On November 29th, Turner met Mooty and her four children for a home visit at the Blackwood Avenue address. *Id.* at p. 364. Turner recalled that the boys were dressed in long jeans and long-sleeve shirts. *Id.* at p. 367. However, because the referral was for emotional maltreatment, without a specific allegation that any of the children had been injured, Turner did not look for, nor did he notice any injuries to the children. *Id.* at pp. 367-68.

{¶ 22} During the visit, Turner and Mooty discussed her domestic violence incident with Watson. *Id.* at p. 368. Mooty initially stated that she and Watson had "had words." *Id.* She then admitted that Watson put his hands around her neck, and head-butted her. *Id.* Mooty also

stated that Watson had anger problems. *Id.* Turner noticed that Mooty was guarded and minimized the physical violence. *Id.* at pp. 368-69.

{¶ 23} As a result of their discussion, Turner and Mooty reached a verbal agreement. Mooty and her children would continue to live at the Blackwood Avenue address, and Joe would not have any unsupervised visits with Mooty's children. Transcript of Trial Proceedings, pp. 369-70. They discussed the importance of keeping Mooty's children safe by not exposing them to physical violence. *Id.* at p. 369. They also discussed the dangers that would occur if the children were exposed to physical violence, such as the violence turning toward the children. *Id.* When Turner ended the home visit, he did not have any concern about the physical welfare of Mooty's children because Mooty appeared to have a good support system: Mooty's family members stated that they would be supportive of Mooty and her children, and Mooty more than once said during this conversation that, "I'm going to stay here. We're going to live here now." *Id*. at p. 383. Turner only later learned that Mooty did not do as she had agreed. *Id.* at p. 372.

{¶ 24} Eight days later, on December 8, 2011, at 9:44 a.m., a registered trauma nurse named Dana Traylor was sitting at the nurses' station at Good Samaritan Hospital, when she observed a nurse practitioner run around the corner carrying a lifeless boy in her arms. The nurse practitioner was screaming for help. *Id*. at pp. 229 and 231. Traylor noted that a person in that state is usually brought in via ambulance, but this boy did not arrive in that manner. *Id.* at p. 231. The ER staff tried to resuscitate Levi. *Id.* at p. 229. They stripped Levi of his zip-up footie sleeper. *Id.* at p. 232. At that time, Traylor noticed a lot of bruises and marks on Levi's body. *Id.* at p. 235. The child gave no indication that he was alive; he had no pulse, and appeared stiff, bruised, and scarred. *Id.* Traylor testified that when a person is stiff in this way, it usually means that the person has been dead for a while. *Id.* at p. 236. Levi was pronounced dead at

10:08 a.m. *Id.* at p. 245.

{¶ 25} Around the same time that Levi was pronounced dead, Charles Hurley from the Dayton Police Department was on patrol. Dispatch alerted Hurley that the security guards at Good Samaritan Hospital were having some problems. *Id.* at p. 253. When Hurley called the security guards to see if they needed his assistance, they asked that he come to the scene. *Id.* Officer Hurley, Officer Sean Humphrey, and Officer Gustweiler each responded. *Id.* at pp. 253 and 277.

{¶ 26} Officer Hurley arrived first, at 10:22 a.m. Upon arrival, Hurley noticed two security guards standing in the emergency room parking lot, watching a man (later identified as Joe Watson) interact with a hospital employee. Transcript of Trial Proceedings, p. 254. Hurley noticed that Watson was acting out. Hurley then approached the security officers, and asked them what was going on. *Id.* Hurley was told that Watson was the father of a deceased two-year-old, and for some reason, the officers' uniforms seemed to upset him. *Id.* Hurley assumed from this conversation that Watson was a grieving father, and let him vent. *Id.* Hurley observed Watson yelling, "I don't want to go to jail, I'm not going to jail. I can't believe this happened." *Id.* at pp. 254-55. Watson then punched and head-butted a wall. *Id.* at p. 255.

{¶ 27} Officer Hurley moved closer. *Id.* Hurley became concerned about the hospital employee's safety. *Id.* Watson began moving farther and farther away from the parking lot. *Id.* Watson then went through a gap between the fence and the side of the building, and disappeared around the corner. *Id.* The employee went in after him, and Hurley followed. *Id.* Hurley then approached Watson, who told him that he did not want to go to jail. *Id.* at p. 256. At that point, Hurley said to Watson, "Nobody's going to jail. I don't even know what happened yet." *Id.* Watson was agitated and was shouting. *Id.*

{¶ 28} Because Watson told Hurley that Levi's injuries had occurred at his address, Hurley notified his supervisor, who dispatched a crew to that location. *Id.* at p. 257. Watson claimed that Levi had fallen down the basement stairs, and said he had driven Levi to Good Samaritan Hospital when he realized that Levi was unresponsive. *Id.* After getting Watson back towards the front door of the hospital, Hurley eventually ended up in the room where Levi's body was being kept. *Id.* at pp. 258-59.

{¶ 29} After Mooty arrived at the hospital, Officer Humphrey brought her back to Levi's room, where Levi's body was covered to the neck with a blanket. Transcript of Trial Proceedings, p. 280. Officer Humphrey observed Mooty enter the room and sit in the chair next to the hospital bed. *Id.* Mooty did not cry, nor did she express any emotion. *Id.* To Officer Hurley, Mooty appeared calm and normal when sitting in the chair next to Levi's bed. *Id.* at pp. 260-63. Officer Hurley told Mooty that he had been directed to give her a ride downtown, but that he would give her a few minutes to say her goodbyes. *Id.* at p. 260.

{¶ 30} On the way downtown, Mooty spoke to Officer Hurley about Levi. *Id.* at p. 262. Mooty said that she had not seen the child, but that Watson had called the day before, and had said that Levi was sick and had not been eating. *Id.* Mooty said that she tried to schedule an appointment for Levi, but Watson called her back to say that Levi had eaten some soup, and that he thought Levi would be fine. *Id.* Hurley noticed that Mooty was surprisingly calm and normal during their entire transaction. *Id.* at p. 263.

{¶ 31} Detective Jerome Dix and Detective Engel from the Dayton Police Department interviewed Michelle Mooty about what she knew regarding the circumstances surrounding Levi's death. The interview was recorded. *Id.* at p. 411 and 452; State's Ex. 89A. Mooty stated that she was willing to speak to the detectives. At first, Mooty claimed that she was never present

when Levi sustained his injuries, though she did say she saw them, and would ask Watson how they happened. State's Ex. 89A, at 8:30 and 9:12-9:23. For example, Mooty asked Watson about a scar on Levi's stomach and a bruise on his face, but Watson explained the injuries by saying that Levi had fallen on the glass table. *Id.* at 9:35-9:39. Mooty also initially claimed that when she gave Levi a bath four days before he died, she mostly saw only a few older injuries, such as the ones on his stomach, on the top right of his thighs, and one on the right side of his face. *Id.* at 14:05-14:38, 14:44, and 15:05.

{¶ 32} However, as the interview progressed, Mooty admitted that she had seen more than she initially claimed. Mooty admitted that she knew Watson had anger problems; he had abused her in the past by putting his hands around her neck. *Id.* at 16:16 and 22:09. In addition, Mooty stated that everyone in the house was scared of Watson. *Id.* at 21:54.

{¶ 33} Mooty denied ever personally disciplining Levi with a belt, explaining that he was too young for it. State's Ex. 89A. However, although Mooty first claimed that she was never present when Levi's injuries occurred, she later admitted that she saw Watson strike Levi. At first she indicated that this only happened one time. She stated that "I definitely saw him hit him once." State's Ex. 89A, at 44:15. Mooty then demonstrated what she saw, by holding her hand up as if an object was in it, striking down. *Id.* at 44:33. Mooty also admitted to having seen Watson strike Levi at least four times since Thanksgiving, "mostly with a hanger, the rest with a belt." *Id.* at 48:42-54.

{¶ 34} Mooty further admitted that on the weekend before Levi died, she saw Watson strike Levi with a hanger. *Id.* at 45:54. She interjected that "it hurts so bad, because I know I didn't do nothin'." *Id.* at 45:14. She explained that she asked Watson, "What are you doing hitting my son?" *Id.* at 46:53. Watson responded by saying, "He acts like he can't listen." *Id.*

at 47:14. In response, Mooty said, "Don't hit my son like that," and Watson "went off." *Id.* at 47:14-45. They got in an argument. *Id*. at 47:45. Although Mooty said that she stood up and argued with Watson, Mooty admitted that she did not intervene. *Id.* at 54:57. She explained that Levi had stopped crying, and had started to play. *Id.* at 55:47. Mooty then interjected, "I knew that it was my fault, at that point." *Id.*

{¶ 35} During the video interview, Mooty admitted that she had seen more injuries on Levi on Sunday, when she bathed him, than she had first indicated. Specifically, Mooty saw injuries "all over" Levi's body while bathing him. This was three to four days before Levi died. State's Ex. 89A, at 13:20-25. Detective Dix asked Mooty to admit that what she saw on Levi's body was horrific, and Mooty agreed that it was. *Id.* at 19:35.

{¶ 36} Mooty left Levi in Watson's care that Sunday night, up until the day Watson brought Levi into the hospital. Mooty had an alternative, however – she could have taken her children over to her mother, who wanted them there. *Id.* at 19:25, and 49:44.

{¶ 37} Mooty also saw Levi again on Monday night, two to three nights before he died, when she stayed the night at Watson's house. *Id.* at 13:43. Mooty claimed that she paid attention to Levi that night, but it was Watson who gave Levi a bath and changed his diaper. *Id.* at 13:43 and 42:45.

{¶ 38} In addition, Mooty told the detectives that she spoke with Watson on Tuesday, which was one to two days before Levi died. Watson told her that Levi was not feeling well, and had a stomach ache. *Id.* at 17:10. Mooty claimed that she called the doctor and Stacy Hines, Levi's aunt. *Id.* at 30:00. Mooty said that Stacy would take Levi, but Watson refused to give him back. *Id.* at 31:01.

{¶ 39} Finally, Detective Dix asked Mooty who had killed Levi. State's Ex. 89A, at

22:43. Mooty replied that, "I believe it was Joe [Watson]." *Id*. Mooty said that she believed it was Watson because every time Levi was with Watson, something happened to him. *Id*.

**{¶ 40}** After Levi died, Mooty also spoke about Levi with James Turner from Children Services. During Turner's visit, Mooty told Turner what she previously failed to tell him during his visit in November 2011. Transcript of Trial Proceedings, p. 371. Specifically, Mooty said that before Turner's initial visit, Watson had physically punished Levi by spanking him with a belt. *Id*. at p. 372. Mooty explained her failure by stating that she was in the other room when it happened, and that she did not know why Watson did it. *Id*. at pp. 373-74. Mooty added, "It's not like he beat him [Levi] or anything." *Id*. at p. 373. In addition, Mooty told Turner that, despite their verbal agreement, she and her children had been living most of the time with Watson. *Id*. at p. 372.

**{¶ 41}** Levi's autopsy exposed fatal internal injuries and multiple external injuries, which were explained to the jury by the coroner who did his autopsy, and by Detective Dix, a veteran officer and instructor in recognizing physical signs of abuse in their various stages of healing. *Id*. at pp. 184-86 and 411-12.

**{¶ 42}** Levi's autopsy revealed that he suffered from fatal internal injuries, injuries that would have been symptomatic to those around him prior to death. *Id*. at p. 201. For example, Levi had an acute injury to his liver, which would have been painful. State's Ex. 21; Transcript of Trial Proceedings, p. 204. Levi was likely complaining of pain, or acting differently as a result of that injury. *Id*. at p. 204. Furthermore, Levi sustained a fatal injury to his heart, represented by hemorrhaging, bruising and tearing, from blunt force trauma. State's Ex. 23; Transcript of Trial Proceedings, pp. 205-06. Levi would have had pretty significant symptoms from that injury as well. *Id*. at p. 206.

{¶ 43}  Both the coroner and Detective Dix observed innumerable visible external injuries that Levi sustained all over his body.  *Id.* at pp. 189, 190, 437, 440, and 443. The coroner, who did not date Levi's injuries, described them in their various stages of healing; some he described as acute or new, while others were determined to be well-healed scars.  *Id.* at pp. 190, 199, and 213.  Detective Dix was able to give an approximate time range for Levi's injuries.  *Id.* at pp. 411-12, and 417.  For example, Levi suffered from massive trauma to his ribcage, which was determined to be acute, or zero to one day old.  *Id.* at p. 434.  Levi also had bruising on his head and above his eye that was estimated to be five to seven days old.  *Id.* at pp. 428 and 431.  In addition, Levi had scarring on his left side and on his triceps, represented by a distinctive looping pattern, which was at least 21 days old.  *Id*. at pp. 435-36 and 439-440.  Levi suffered massive trauma to his upper thigh, represented by a burn, 21-day old bruising on the lower portion of his thigh, and acute injuries that were zero to one day old.  *Id.* at pp. 442-43.  Further, Levi had injuries to his penis, some of which were determined to be one to two days old.  *Id*. at pp. 445-46.  Finally, there was a well-healed scar just above Levi's penis, and a healed injury to the tip.  Ex. 29; Transcript of Trial Proceedings, pp. 445-46.

{¶ 44}  The blunt force trauma that Levi sustained was caused by various objects – from being punched and burned with a cigarette-like object, to being whipped with a wire hanger, a hair pick, and a VCR cord.  *Id.* at pp. 212, 433-34, 436-37, and 442.  For example, a burn on Levi's thigh was consistent with his having been burned with a cigarette-like object.  *Id.* at pp. 436-37. The massive trauma Levi suffered to his ribcage was consistent with his having been punched with a fist.  *Id*. at p. 434.  Furthermore, the looping-style patterns on much of Levi's body, like those found on the lower portion of his thigh, were determined to have been caused by a wire hanger-like object.  *Id*. at pp. 442-43 and 436-37.  A different type of patterned scar, consistent

with a hair pick, was found on the front of Levi's thighs.   State's Ex. 30; Transcript of Trial Proceedings, p. 212.

### III.   LEGAL ANALYSIS

### A.   FIRST ASSIGNMENT OF ERROR

**{¶ 45}**   Mooty's First Assignment of Error states that:

> THE TRIAL COURT ERRED AS A MATTER OF LAW BY IMPOSING SEPARATE SENTENCES FOR PERMITTING CHILD ABUSE, COMPLICITY TO COMMIT FELONIOUS ASSAULT AND ENDANGERING CHILDREN WHEN THESE OFFENSES ARE ALLIED OFFENSES OF SIMILAR IMPORT.

**{¶ 46}**   Since Mooty did not raise the issue of merging the counts as allied offenses at the trial court level, we must apply a plain error analysis. We have previously held that:

> Defendant failed to argue in the proceedings before the trial court that his aggravated burglary and aggravated robbery offenses are allied offenses of similar import that must be merged. Defendant has therefore waived all error except plain error.   *State v. Coffey,* 2d Dist. Miami No. 2006 CA 6, 2007–Ohio–21, at ¶ 14.   To prevail under the plain error standard, an appellant must demonstrate both that there was an obvious error in the proceedings and that but for the error, the outcome of the trial clearly would have been otherwise.   *State v. Noling,* 98 Ohio St.3d 44, 2002–Ohio–7044.   *State v. Turner*, 2d Dist. Montgomery No. 24421, 2011-Ohio-6714, ¶ 8.

**{¶ 47}**   We recently analyzed whether failure to report child abuse or neglect in violation of 2151.421(A)(1)(a) and the charge of knowingly failing to provide for a functionally impaired

person in violation of R.C. 2903.16(A) are allied offenses. *State v. Kilby*, 2d Dist. Montgomery No. 25650, 2013-Ohio-5340. In that case, we set forth the applicable law as follows:

> The State asserts that "the crimes at issue herein were not predicated upon the same conduct committed by Mary Kilby, but rather were the result of different conduct: her failure to provide proper medical and physical care to Makayla, as opposed to her failure to report the abuse or neglect of Makayla that was committed by others who were responsible for her care." Kilby again relies upon the references in the Bill of Particulars and Sentencing Memorandum regarding Kilby's failure to report, and she asserts that "such references can only mean that in connection with the felony prosecution for failure to provide care or services, the State's theory was that there was a continuing course of conduct (or inaction) that included both the failure to provide direct physical care for Makayla and the failure to report the living conditions and other signs of neglect to authorities." * * *

> R.C. 2941.25 provides as follows:

> (A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one. (B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such

offenses, and the defendant may be convicted of all of them.

As this Court has previously noted:

"R.C. 2941.25 codifies the double jeopardy protections in the federal and Ohio Constitutions, which prohibit courts from imposing cumulative or multiple punishments for the same criminal conduct unless the legislature has expressed an intent to impose them. R.C. 2941.25 expresses the legislature's intent to prohibit multiple convictions for offenses which are allied offenses of similar import per paragraph (A) of that section, unless the conditions of paragraph (B) are also satisfied." *State v. Barker*, 183 Ohio App.3d 414, 2009-Ohio-3511, ¶ 22, citing *State v. Rance*, 85 Ohio St.3d 632, 1999-Ohio-291, overruled on other grounds by *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314. *State v. Bridgeman*, 2d Dist. Champaign No. 2010 CA 16, 2011-Ohio-2680, ¶ 50. As this Court further noted:

* * * The *Johnson* court overruled *Rance* "to the extent that it calls for a comparison of statutory elements solely in the abstract under R.C. 2941.25." *Johnson* at ¶ 44. Now, "[w]hen determining whether two offenses are allied offenses of similar import subject to merger under R.C. 2941.25, the conduct of the accused must be considered." *Id*. *Johnson* states that "the intent of the General Assembly is controlling." *Id*. at 46. "We determine the General Assembly's intent by applying R.C. 2941.25, which expressly instructs courts to consider the offenses at issue in light of the defendant's conduct." *Id*. The trial

court must determine prior to sentencing whether the offenses were committed by the same conduct. The court no longer must perform any hypothetical or abstract comparison of the offenses at issue in order to conclude that the offenses are subject to merger. *Id*. at ¶ 47. "In determining whether offenses are allied offenses of similar import under R.C. 2941.25(A), the question is whether it is possible to commit one offense and commit the other with the same conduct, not whether it is possible to commit one *without* committing the other. If the offenses correspond to such a degree that the conduct of the defendant constituting commission of one offense constitutes commission of the other, then the offenses are of similar import." *Id.* at ¶ 48 (internal citation omitted). "If the multiple offenses can be committed by the same conduct, then the court must determine whether the offenses were committed by the same conduct, i.e., a 'single act, committed with a single state of mind.' " *Id.* at ¶ 49 (citation omitted). "If the answer to both questions is yes, then the offenses are allied offenses of similar import and will be merged." *Id.* at ¶ 50. "Conversely, if the court determines that the commission of one offense will *never* result in the commission of the other, or if the offenses are committed separately, or if the defendant has separate animus for each offense, then, according to R.C. 2941.25(B), the offenses will not merge." *Id.* at ¶ 51.

*Bridgeman*, at ¶ 51–53. (Emphasis sic.)

*Kilby* at ¶ 21-26.

**{¶ 48}** In applying the *Johnson* test, we find that it is possible to commit all three offenses alleged in this case with the same conduct. Next, we are required to determine whether the offenses were committed by the same conduct, with a single state of mind, rather than

committed separately or with a separate animus for each offense. **{¶ 49}** We have held that when one offense is completed prior to the completion of another offense during the defendant's course of conduct, those offenses are separate acts. *State v. Turner*, 2d Dist. Montgomery No. 24421, 2011-Ohio-6714, ¶ 24. In *Turner*, the two offenses were burglary and robbery. The offender committed the burglary upon forcing his way into the home, and committed the robbery when he beat and robbed the occupants. In this regard, we stated that:

> Because one offense was complete before the other offense occurred, the two offenses were committed separately for purposes of R.C. 2941.25(B), notwithstanding their proximity in time and that one was committed in order to commit the other. *Id.*

**{¶ 50}** In determining whether an offender's conduct involved separate acts or a separate animus, we must consider whether the acts were separated by time or conduct. *State v. Tapscott*, 2012-Ohio-4213, 978 N.E. 2d 210 (7th Dist.), ¶ 39. Accordingly, we will evaluate the evidence regarding any separation in time, Mooty's animus, and the nature of the offenses.

### 1. After July 1, 2011 - Endangering Children

**{¶ 52}** The evidence shows the child endangering began in July, when members of Levi's family expressed concern over his injuries. Substantial risk of harm to Levi also occurred in October when Levi's aunt, Stacey Hines, returned Levi to Mooty's care and Mooty continued to allow Watson to have access to Levi. During that time span, Levi's father observed a bruise on Levi's ear in July and reported it to Children Services. In September, when Stacey picked Levi up from Mooty, Stacy observed significant signs of neglect and significant bruising over Levi's body, as well as infected scratches. Stacey took pictures of the injuries, texted them to Mooty, and

demanded an explanation. Mooty denied knowing about the injuries. Watson was also heard loudly denying that Levi had any bruises and explaining how they might have happened, if they did exist.

{¶ 53} In mid-October 2011, Children Services received a referral that Mooty had been involved in a domestic violence incident. When Mooty was interviewed by Children Services on November 29, 2011, she admitted that Watson put his hands around her neck and head butted her. She minimized the incident. Mooty agreed to not allow Watson to have any unsupervised visits with her children, and that she and her children would live with her mother, rather than Watson.

{¶ 54} After Levi died, Mooty admitted observing Watson strike Levi at least four times with a hanger and a belt since Thanksgiving.

{¶ 55} After Levi's death, Mooty admitted to Children Services that prior to the November 29th meeting, Watson had spanked Levi with a belt, but she did not tell the representative this during his visit. Mooty admitted that she did not abide by the agreement to live apart from Watson and to not allow Watson access to the children.

2. After December 4 - Complicity to Commit Felonious Assault

{¶ 56} After Levi died, Mooty admitted that she had seen Watson strike Levi with a hanger the weekend before he died (December 3-4, 2011) because Levi would not listen. Mooty told detectives, "I knew it was my fault at that point."

{¶ 57} Furthermore, Mooty admitted to detectives that on Sunday, December 4, 2011, she had noticed injuries all over Levi's body when she bathed him. Mooty agreed that the injuries were "horrific." Afterward, on Sunday night, Mooty left Levi in Watson's care until Levi died on Thursday, December 8, 2011. On Monday night, Mooty spent the night with Watson.

Watson bathed Levi and changed his diaper that night. The bruising observed by the Coroner on Levi's head and eye were estimated to be five to seven days old. Therefore, Mooty would have observed these injuries on Sunday night when she bathed Levi.

{¶ 58}  On Tuesday, December 6, 2011, Watson telephoned Mooty to tell her that Levi was not feeling well.   When Mooty told Watson that she would obtain a doctor's appointment or that Stacey Hines would take Levi, Watson refused to give him back.

### 3.  After December 7 - Permitting Child Abuse

{¶ 59}  Levi suffered from fatal blunt force trauma resulting in acute injury to his liver and heart. These injuries would have been very painful, and Levi's discomfort would have been noticeable. There is no evidence that Mooty observed Levi after Monday night.

{¶ 60}   The Coroner estimated that Levi suffered massive trauma to his rib cage zero to one day old, consistent with his having been struck with a fist.   Injuries to Levi's penis were estimated to be one to two days old, with a healed scar just above the penis and a healed injury to the tip.

{¶ 61}  The numerous blunt force trauma was administered with a variety of objects. Over time, Levi was punched and burned with a cigarette like object, whipped with a wire hanger, and hurt with an object that left a scar consistent with a hair pick.

{¶ 62}  Although the offense dates, as alleged, overlapped in progression, the evidence established that all the elements of each offense were satisfied prior to the commencement of the subsequent offense.   We have held that when the elements of a separate offense are satisfied and are separated in time from a subsequent offense, they are not allied offenses.  *Turner*, 2d Dist. Montgomery No. 24421, 2011-Ohio-6714, at ¶ 23 (involving a burglary committed upon entering

a home and a robbery that followed, inside the home).

**{¶ 63}** In support of her position, Mooty cites *State v. Craycraft,* 193 Ohio App.3d 594, 2011-Ohio-413, 953 N.E.2d 337 (12th Dist.). *Craycraft* involved charges of felonious assault, second and third degree child endangering, and domestic violence against two-month old twins. We distinguish *Craycraft* from the facts of this case for several reasons. First, the case was tried differently, because it was tried prior to *Johnson*. There was no articulation as to what evidence pertained to any particular count. The charges were also never connected to particular instances of the appellant's conduct. As far as the court of appeals could ascertain, the State relied upon the same evidence to prove all of the counts. *Id.* at ¶ 17-20. That situation is not present here.

**{¶ 64}** The facts stated above demonstrate that Mooty's animus in violating her duty of care, protection, and support resulting in serious physical harm to Levi beginning in July 2011, was separated in time from the two other offenses she committed in December 2011.

**{¶ 65}** The December 2011 offenses of Complicity to Commit Felonious Assault and Permitting Child Abuse were also separated in time. They also involved crimes of clearly different duties and animuses. For example, the Complicity to Commit Felonious Assault was premised on Mooty knowingly assisting Watson in inflicting serious physical harm to Levi on the weekend of December 3 and 4, 2011, by giving Watson access to Levi that weekend in light of her knowledge of past abuse and the abuse she witnessed that weekend.

**{¶ 66}** The evidence summarized above indicates that Levi suffered fatal injuries on Wednesday, December 7, 2011, and Thursday, December 8, 2011. On the previous Sunday night, while bathing Levi, Mooty admittedly observed the clear indications of "horrific" physical harm inflicted by Watson over the weekend. Nonetheless, Mooty again gave Watson access to Levi until his death on the following Thursday. Mooty spent Monday night with Levi and

Watson, but she did not examine or bathe Levi. Accordingly, the offense of Permitting Child Abuse, which requires that Mooty recklessly caused Levi's death as a result of abuse, torture, corporal punishment, or physical restraint, was separated in time and required a different animus than the Complicity to Commit Felonious Assault, which was committed the previous weekend.

**{¶ 67}** As noted above, R.C. 2941.25(B) permits imposition of sentence for two or more offenses of the same or similar kind committed separately or with a separate animus. Considering the nature of Mooty's conduct and her awareness of the escalating harm and danger to Levi, the substantial time separating her acts, and the fact each offense was essentially completed prior to the commencement of the following offense, we find that the three convictions were committed separately and with a separate animus as to each. Accordingly, we overrule Mooty's first assignment of error.

## B. SECOND ASSIGNMENT OF ERROR

**{¶ 68}** Mooty's second assignment of error states that:

THE TRIAL COURT'S IMPOSITION OF CONSECUTIVE SENTENCES WAS DISPROPORTIONATE TO THE SERIOUSNESS OF THE APPELLANT'S CONDUCT AND TO THE DANGER SHE POSED TO THE PUBLIC; THEREFORE THE SENTENCES SHOULD BE REVERSED.

**{¶ 69}** The trial court made the necessary findings to support imposing consecutive sentences under R.C. 2929.14(C). The standard in reviewing criminal sentences is explained in *State v. Rodeffer*, 2d Dist. Montgomery Nos. 25574, 25575, 25576, 2013-Ohio-5759:

In order to be consistent with the approach of other Ohio appellate districts that have already considered this issue in light of H.B. No. 86, we will no longer

apply the two-part test in *Kalish* when reviewing felony sentences controlled by H.B. 86. From now on we will use the standard of review set forth in R.C. 2953.08(G)(2).

R.C. 2953.08(G)(2) states that "[t]he appellate court may increase, reduce, or otherwise modify a sentence that is appealed * * * or may vacate the sentence and remand the matter to the sentencing court for resentencing." The statute also explicitly states that "[t]he appellate court's standard for review is not whether the sentencing court abused its discretion." Instead, the appellate court may take any action authorized under R.C. 2953.08(G)(2) if the appellate court "clearly and convincingly" finds either of the following:

(a) That the record does not support the sentencing court's findings under division (B) or (D) of section 2929.13, division (B)(2)(e) or (C)(4) of section 2929.14, or division (I) of section 2929.20 of the Revised Code, whichever, if any, is relevant;

(b) That the sentence is otherwise contrary to law. R.C. 2953.08(G)(2)(a)-(b).

It is important to note "that the clear and convincing standard used by R.C. 2953.08(G)(2) is written in the negative. It does not say that the trial judge must have clear and convincing evidence to support its findings. Instead, it is the court of appeals that must clearly and convincingly find that the record does not support the court's findings." [State v.] Venes, 2013-Ohio-1891, 992 N.E.2d 453, [(8th Dist.)] at ¶ 21. "In other words, the restriction is on the appellate court, not

the trial judge. This is an extremely deferential standard of review."

*Rodeffer* at ¶ 29-31.

**{¶ 70}** We do not clearly and convincingly find that the record fails to support the court's findings or that the sentence is otherwise contrary to law. Accordingly, we overrule Mooty's second assignment of error.

### C. THIRD AND FOURTH ASSIGNMENTS OF ERROR

**{¶ 71}** Mooty's Third and Fourth Assignments of Error state that:

THE EVIDENCE WAS INSUFFICIENT TO PROVE COMPLICITY TO COMMIT FELONIOUS ASSAULT ABSENT EVIDENCE THAT APPELLANT AIDED OR ABETTED ANOTHER OR POSSESSED THE CRIMINAL INTENT OF A PRINCIPAL.

THE GUILTY VERDICTS FOR PERMITTING CHILD ABUSE, COMPLICITY TO COMMIT FELONIOUS ASSAULT AND CHILD ENDANGERING ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

**{¶ 72}** We recently stated the law on sufficiency of evidence and manifest weight of the evidence.

When reviewing the denial of a Crim.R. 29(A) motion, an appellate court applies the same standard as is used to review a sufficiency of the evidence claim. State v. Sheppeard, 2d Dist. Clark No. 2012 CA 27, 2013–Ohio–812, ¶ 51. "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury

or sustain the verdict as a matter of law." State v. Wilson, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing State v. Thompkins, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).

When reviewing whether the State has presented sufficient evidence to support a conviction, the relevant inquiry is whether any rational finder of fact, after viewing the evidence in a light most favorable to the State, could have found the essential elements of the crime proven beyond a reasonable doubt. State v. Dennis, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997). In conducting a sufficiency-of-the-evidence analysis, the reviewing court should consider all of the evidence admitted at trial, whether erroneously or not, and double jeopardy does not bar retrial where "trial error" resulted in the improper admission of evidence. State v. Brewer, 121 Ohio St.3d. 202, 2009–Ohio–593, 903 N.E.2d 284, ¶ 17–20. *Contrast State v. Kareski,* 137 Ohio St.3d 92, 2013-Ohio-4008, 998 N.E.2d 410, ¶ 16. A guilty verdict will not be disturbed on appeal unless "reasonable minds could not reach the conclusion reached by the trier-of-fact." *Dennis* at 430.

In contrast, "a weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." *Wilson* at ¶ 12. *See Eastley v. Volkman,* 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 19 (" 'manifest weight of the evidence' refers to a greater amount of credible evidence and relates to persuasion"). When evaluating whether a conviction is against the manifest weight of the evidence, the appellate court must review the entire record, weigh the

evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." Thompkins, 78 Ohio St.3d at 387, 678 N.E.2d 541, citing State v. Martin, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. State v. Lawson, 2d Dist. Montgomery No. 16288, 1997 WL 476684 (Aug. 22, 1997). However, we may determine which of several competing inferences suggested by the evidence should be preferred. The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence. *Wilson* at ¶ 14. A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. Martin, 20 Ohio App.3d at 175, 485 N.E.2d 717.

*State v. Cole*, 2d Dist. Miami No. 2013 CA 18, 2014-Ohio-233, ¶ 3-6.

**{¶ 73}** In the case before us, Watson's assaultive abuse against Levi escalated in intensity and nature over a long period of time. Mooty's awareness of it was substantial and cumulative. On the dates alleged, there was substantial evidence that Mooty had knowledge that Watson would probably cause serious physical harm to Levi if she gave Watson access to Levi. When construing the evidence in a light favorable to the State, there was sufficient evidence of

Complicity to Commit Felonious Assault.

{¶ 74} Furthermore, the evidence in this case is overwhelming in favor of guilt. There is no indication that the jury lost its way, and there are no exceptional circumstances warranting reversal. The convictions on all charges, therefore, are not against the manifest weight of the evidence. Accordingly, Mooty's Third and Fourth Assignments of error are overruled.

{¶ 75} We have overruled Mooty's four assignments of error and affirm the trial court judgment.

. . . . . . . . . . . . .

HALL, J., concurs.

DONOVAN, J., concurring:

I agree with the ultimate resolution and affirmance of this case. However, I reiterate my disagreement with the analysis as set forth in *Rodeffer*.

. . . . . . . . . .

Copies mailed to:

Mathias H. Heck
April F. Campbell
Michael C. Thompson
Hon. Frances E. McGee